# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN WEBB, | Civil No. 13-1947 (JRT/JJK) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT OPINIONS OF DEFENDANT'S EXPERTS** |
| v. | |
| ETHICON ENDO-SURGERY, INC., | |
| Defendant. | |

William L. Tilton and George Dunn, **TILTON & DUNN, P.L.L.P.**, 101 Fifth Street East, Suite 2220, St. Paul, MN 55101, for plaintiff.

David R. Noteware, Timothy Hudson, and Janelle L. Davis, **THOMPSON & KNIGHT LLP**, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX 75201; and Sheryl A. Bjork, **BOWMAN & BROOKE LLP**, 150 South Fifth Street, Suite 3000, Minneapolis, MN 55402, for defendant.

Susan Webb brings this action against Ethicon Endo-Surgery, Inc. ("Ethicon"), alleging permanent injuries resulting from a defective Ethicon surgical stapler. This matter is now before the Court on Webb's motion to exclude or limit the testimony of three of Ethicon's expert witnesses: Dr. Richard Rubenstein, Dr. Mark Levy, and Dr. Ronald Roberts. Because the Court concludes that all three experts' testimony is relevant and Webb has not shown that their methods are unreliable, the Court will deny the motion at this time.

# BACKGROUND[1]

## I.   DR. RUBENSTEIN

Webb first objects to Dr. Richard Rubenstein.  Dr. Rubenstein is a practicing neurologist in Richmond, California.  (Decl. of Richard Rubenstein ("Rubenstein Decl.") ¶ 3, Apr. 22, 2015, Docket No. 317.)  Ethicon retained him to provide an expert opinion on whether Webb's cognitive impairment is the result of her postoperative complications – particularly her Intensive Care Unit ("ICU") hospitalization – or a history of polysubstance abuse and mood disorders.  (*Id.*, Ex. H (Expert Report of Richard Rubenstein ("Rubenstein Report")) at 2-3.)[2]

Dr. Rubenstein reviewed nearly 200 documents in this case, including a multitude of medical records, some school and employment records, Social Security Administration reports, police incident reports, declarations and depositions from various individuals connected to Webb's care, and correspondence and legal filings from this case.  (*Id.* at 3-7.)  Based on his review of these records, he offers a number of opinions about Webb's cognitive decline, explaining why he believes her ICU hospitalization did not cause a brain injury and how her drug and alcohol use are sufficient to explain her current condition.

---

[1] A description of Webb's surgery and the facts on which she bases her claims against Ethicon can be found in the Court's previous Order.  *See Webb v. Ethicon Endo-Surgery, Inc.*, No. 13-1947, 2014 WL 7213202, at *1-*4 (D. Minn. Dec. 17, 2014).  The Court will not repeat that history here.

[2] With the exception of deposition transcripts and documents filed under seal, all page numbers refer to CM/ECF pagination.

A.    ICU Hospitalization

Dr. Rubenstein concludes that Webb's ICU hospitalization did not cause her to suffer a brain injury.  "The two most important factors associated with critical illness brain injury[ are] cerebral blood flow and oxygenation."  (*Id.* at 9.)  Webb was admitted to the ICU on August 5, 2009, following her July 29 gastrointestinal surgery.  (*Id.* at 2, 8.)  During her ICU hospitalization, Dr. Rubenstein notes that Webb's blood pressure results did not indicate any continuous or sustained periods of hypotension.  (*Id.* at 8.)  On the other extreme, she experienced no episodes of hypertensive encephalopathy, a condition caused by a sudden and rapid elevation in blood pressure.  (*Id.*)

Additionally, her oxygen saturation levels "varied between normal and, for the most part, in the 80s and 90s during the period from her second surgery through August 15. . . . On a day-to-day basis the lowest period of oxygen saturation was 74 during the 24-hour period of August 9 to August 10, 2009."  (*Id.*)  Webb did experience "intermittent bouts" of hypoxemia – a low oxygen saturation in the blood – and hypoxia – a low oxygen concentration in bodily tissues.  (*Id.* at 8-9; Decl. of Michael Gross ("Gross Decl."), Ex. 2 (Report of Wes Ely) at 4, 7, Apr. 1, 2015, Docket No. 306.)  Dr. Rubenstein opines that these did not affect Webb because her blood pressure remained sufficiently elevated, explaining that "[t]he brain is able to tolerate significant bouts of hypoxemia for considerable periods of time as long as blood pressure is maintained."  (Rubenstein Report at 8.)  Similarly, Dr. Rubenstein points out in his report that "[h]ypoxia in the setting of normal cerebral blood flow does not result in structural brain injury."  (*Id.*)

Webb also experienced septic shock and intermittent periods of delirium while she was hospitalized at the ICU.  (*Id.* at 9-10.)  Dr. Rubenstein observes that "[e]ven in severe septic shock, cerebral autoregulation is maintained over a wide range of blood pressures until a critical pressure of 50 mmHg is reached."  (*Id.* at 9.)  He opines that in Webb's case, "day-by-day blood pressures disclosed no episodes of sustained hypotension that even approached levels which would impact cerebral autoregulation.  Similarly, observed episodes of oxygen desaturation were likewise insufficient to result in structural brain injury in the setting of normal cerebral blood flow."  (*Id.*)  In other words, even if Webb experienced periods of septic shock and delirium, the relative stability of her blood pressure would counteract the possibility that poor oxygen saturation could affect her long-term cognitive function.

As further support for this conclusion, Dr. Rubenstein notes that in the seven days between Webb's July 29 surgery and her exploratory laparotomy procedure – the secondary surgery on August 6 during which Webb's health was the most unstable – her "blood pressure, pulse oximeter oxygen saturations and laboratory values disclosed no overarching predisposition to structural brain injury.  Her hemoglobins and blood sugars were likewise insufficient to result in anything more than a transient and reversible perturbation of brain function."  (*Id.* at 9-10.)  Prior to the exploratory laparotomy, Webb was routinely alert and oriented in the ICU, and she was heavily sedated as a protective measure between August 6 and August 10, "the most critical and unstable window."  (*Id.* at 10.)  From his review of Webb's medical records during her ICU stay, Dr. Rubenstein

determined that none of the entries reflect "prolonged or continuous periods of delirium" sufficient to cause a critical brain injury.  (*Id.*)

Finally, Dr. Rubenstein explains that the mechanism of cognitive impairment attributable to encephalopathy or severe sepsis is brain atrophy, and he suggests that, when sufficient to cause cognitive loss, brain atrophy is visualizable on a brain scan or imaging study.  (Gross Decl., Ex. 7 (Dep. of Richard A. Rubenstein ("Rubenstein Dep.")) at 75:4-78:10.)   A partial noncontrast MRI brain scan was performed on Webb on August 21, 2014.  (*Id.* at 76:2-5.)  The MRI was not completed because it was performed in a closed MRI and Webb had a panic attack, requiring the interruption of the scan.  (*Id.* at 76:5-7.)   Consequently, the results are incomplete, but Dr. Rubenstein and his neuroradiologist reviewed the sequences that were able to be completed and saw no evidence of brain atrophy.  (*Id.* at 76:8-17.)

### B.    Drug and Alcohol Use

As an alternative to the theory that Webb's ICU hospitalization caused a critical brain injury, Dr. Rubenstein concludes that "[i]t is more likely than not in my opinion that Ms. Webb continues to abuse methamphetamine and/or other illicit drugs, cannabis, alcohol and caffeine, all of which singly or in concert are sufficient explanation to cloud her genetically endowed low average IQ."  (Rubenstein Report at 19.)  He notes that as early as her teenage years, Webb began using drugs and alcohol, and in the decade prior to her 2009 surgeries, she presented to treatment providers as "delusional and unable to cope with the stresses of her family and marital problems."  (*Id.* at 12.)  Beginning in

2007, Webb was engaged in a number of domestic disputes that led to police involvement and, in some cases, assault charges.  (*Id.*)

During the year preceding Webb's surgery, she was put on an alcohol withdrawal protocol.  (*Id.*)  She had been suffering from depression, living in and out of her car, and struggling to recover from losing three friends to suicide in the prior two years.  (*Id.* at 13.)  Webb herself expressed suicidal behavior, and after breaking a window to enter her boyfriend's apartment, destroying property inside the apartment, and expressing a desire to obtain a gun to commit suicide, she was incarcerated by the police on March 18, 2009, as a protective measure.  (*Id.* at 12-13.)  On the same day, she had a preliminary drug screen that tested positive for amphetamines.  (*Id.* at 13.)

Throughout 2009, both before and after her surgeries, Webb was seen by doctors, psychologists, and other care providers.  Dr. Rubenstein explains that those providers' appointment notes reflect that Webb's alertness, memory, and speech were all normal or within functional limits by late August 2009, although she demonstrated reduced processing speed.  (*Id.* at 14.)  The providers further indicated that Webb appeared to be experiencing emotional turbulence and at times delusions, but not a physical brain injury. (*Id.* at 14-15.)  She was accordingly prescribed several medications to treat a mood disorder.  (*Id.* at 15.)  The first diagnosis of an intellectual impairment came more than two years later, in November 2011, when Dr. Norman Cohen concluded that Webb suffered from dementia.  (*Id.* at 16.)  Dr. Rubenstein observes that across Webb's appointments with different care providers, she has been inconsistent in how she describes her history and current use of drugs and alcohol.  (*Id.* at 17-18.)   In

Dr. Rubenstein's estimation, this inconsistency lowers Webb's credibility and undermines the accuracy of her self-reporting. (*Id.*)

Because extensive substance abuse cannot be ruled out in Webb's case – and is, indeed, likely indicated by some of her self-reporting and her March 2009 preliminary drug screen – Dr. Rubenstein concludes that Webb is an ongoing substance abuser, which explains many of her conditions. (*Id.* at 17-19.) He explains that "[o]ngoing abuse of methamphetamines and/or other illicit drugs results in permanent brain damage long after the abuse has terminated." (*Id.* at 18.) Further, Webb has reported to providers that she has – at least historically – used marijuana to manage anxiety, and chronic cannabis use impairs cognitive function and can manifest in psychotic behavior. (*Id.* at 18-19.) She has also admitted to drinking as many as 24 cups of coffee per day, and "[e]xcessive caffeine intake is associated with . . . anxiety, panic attacks, and elevated blood pressure." (*Id.* at 19.) Based on these associations, Dr. Rubenstein opines that critical brain injury due to Webb's ICU hospitalization cannot be implicated in isolation as the exclusive factor responsible for Webb's current conditions. (*Id.*)

Dr. Rubenstein acknowledges that studies[3] have shown that delirium and critical illness of the sort Webb suffered at the ICU can lead to long-term cognitive impairment. (*Id.* at 10-11.) He points out, however, that "[o]ne of the exclusion criteria in Dr. Jackson's study was active substance abuse," and that the study's findings are

---

[3] In particular, Dr. Rubenstein discusses a study co-authored by Dr. James Jackson, "Long-term cognitive impairment after critical illness," published in the New England Journal of Medicine in 2013. (Rubenstein Report at 10-11; Decl. of James Jackson at 4 n.2, Apr. 1, 2015, Docket No. 307.)

inapplicable in Webb's case because of her alleged historical and continued substance abuse. (*Id.* at 11.) Dr. Rubenstein also critiques the application of the study in Webb's case, because the study participants were – on average – older than Webb, relatively less healthy than Webb prior to critical illness, and they had unknowns as to prior drug use or preexisting cognitive impairment. (*Id.* at 11-12.) Accordingly, Dr. Rubenstein concludes that the study is of little assistance in evaluating Webb's situation and that Webb's cognitive decline is better explained through her substance abuse.

## II.    DR. LEVY

Second, Webb objects to the proposed testimony of Dr. Mark Levy, a psychiatrist. Dr. Levy concluded that Webb has a mild cognitive impairment. (Gross Decl., Ex. 5 (Excerpts from Dep. of Mark Levy ("Levy Dep. Excerpts I")) at 137:21-138:1.) Like Dr. Rubenstein, Dr. Levy concluded that Webb's substance abuse contributed to her mild cognitive impairment. (Decl. of Timothy E. Hudson ("Hudson Decl."), Ex. E (Excerpts from Dep. of Mark Levy ("Levy Dep. Excerpts II")) at 147:22-148:2, Apr. 22, 2015, Docket No. 316.) As the basis for his opinion, Dr. Levy points to multiple admissions by Webb of extensive alcohol and marijuana use, records of alcohol use dating back to her childhood, a positive amphetamine urine test, confession to illicit Adderall use, avoidance of psychotherapy session, and misrepresentations about her substance use to mental health practitioners, as indicative of a person with a substance abuse disorder. (*Id.* at 141:21-145:9.) For example, when Dr. Levy interviewed Webb, she admitted that up until five weeks before the interview she had been drinking a pint of vodka a day and

smoking marijuana all day.  (*Id.* at 142:4-12.)  Dr. Levy noted that in a report from another psychiatrist who saw Webb, Webb is described as admitting that she used methamphetamine, cocaine, LSD, cannabis, and alcohol.  (*Id.* at 142:13-18.) Additionally, Webb reported to Dr. Levy that she drinks twelve to twenty-four cups of coffee per day.  (Levy Dep. Excerpts I at 149:20-21.)  Dr. Levy explained that Webb is "titrating this.  Uppers and downers.  It's speed balling." (*Id.* at 149:21-22.)  He pointed out that even though these are Webb's documented behaviors after the surgery, "you have to explain why that is her mode of choice of comforting herself, of soothing herself, of self-medicating whatever dysphoria she's self-medicating.  And behaviorally [developing these coping strategies in response to a phenomenon like Webb's surgery is] not how people operate.  People develop those patterns much earlier in life." (*Id.* at 150:7-12.)

Dr. Levy explained that Webb did not have any assessments of her neurocognitive functioning before the 2009 surgery, so he does not know with certainty how her neurocognitive disorder progressed.  (*Id.* at 140:8-23.)  He hypothesized, however, that her disorder "was a cumulative effect of multiple substances that she abused at least intermittently over the decades," occurring gradually.  (*Id.* at 140:18-23.)  Relying on Dr. Rubenstein's analysis, Dr. Levy believes that Webb's ICU experience in 2009 was not responsible for her neurocognitive deficit.  (*Id.* at 140:24-141:10.)

## III.    DR. ROBERTS

Finally, Webb seeks to exclude part of the testimony of Dr. Richard Roberts, a neuropsychologist.  Dr. Roberts performed a neuropsychological assessment of Webb on

March 24, 2014.  (Hudson Decl., Ex. J (Report of Dr. Roberts ("Roberts Report") at 2-3.)

The examination was spread over two days.  Webb was "tearful" at the beginning of the

appointment on the first day and expressed a fear that someone would come into the

room to kidnap her.  (*Id.* at 3.)  It took Dr. Roberts approximately ten minutes to calm

Webb down to a point where the examination could begin.  (*Id.*)  On the second day,

Webb indicated that she had gotten much more sleep and seemed cheerful and more

focused.  (*Id.* at 6-7.)

Dr. Roberts administered a number of tests targeting memory and comprehension.

(*Id.* at 7.)  One of the tests was the Wechsler Adult Intelligence Scale-IV ("WAIS-IV").

(*Id.*)  The WAIS-IV yielded a Full Scale IQ for Webb of 74, which is in the 4th percentile.

(*Id.* at 8.)  An average IQ score is anything between 90 and 109.  (Hudson Decl., Ex. G.

(Excerpts from Dep. of Ronald H. Roberts ("Roberts Dep. Excerpts")) at 111:7-8.)  Her

WAIS-IV Vocabulary scaled score – the single score "most highly correlated with overall

intelligence" and "most resilient to change following brain injury" – was 7.  (Roberts

Report at 8.)  Dr. Roberts observed that this is a poor score and would be approximately

equivalent to an IQ of 85, although that estimate might be somewhat inflated due to the

fact that Webb had previously been administered the same test multiple times.  (*Id.*)

Two fairly recent prior intelligence tests – one taken at the hospital in 2009 and

one taken in 2011 – yielded Full Scale IQ scores of 78 and 69, respectively.  (*Id.* at 32.)

An intelligence test – the Lorge-Thorndike – administered to Webb when she was in

grade school in 1970 yielded an IQ estimate of 112 (61st percentile).  (*Id.* at 18.)  At his

deposition, Dr. Roberts testified that the Lorge-Thorndike test "is no longer used and not

the most reliable test that would have been available to assess her intelligence." (Roberts Dep. Excerpts at 115:12-14.)  He elaborated that "it's not a standard that is used by psychologists or neuropsychologists that I have ever heard of.  It's more an academically oriented test, from what I understand, used in schools, and would not be expected to be equivalent to results from the better researched and standardized tests . . . ." (*Id.* at 115:17-22.)

Webb's results from the Personality Assessment Inventory ("PAI") personality functioning test indicated that she suffers from anxiety and depression.  (Roberts Report at 11-12.)  Her responses on the test also indicated that drug and alcohol use may be straining her personal relationships and vocation.  (*Id.* at 12.)  Dr. Roberts ultimately concluded that Webb suffers from chronic underlying psychological problems and has a chronic history of substance abuse.  (*Id.* at 36.)

## ANALYSIS

## I.   STANDARD OF REVIEW

Under Federal Rule of Evidence 702, expert testimony must satisfy three prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy.  Second, the proposed witness must be qualified to assist the finder of fact.  Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . .

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citations and internal quotation marks omitted).  The district court has a gate keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).

The Supreme Court in *Daubert* outlined particular factors for courts to consider in assessing reliability, such as (1) whether the opinion is based on scientific knowledge, is susceptible to testing, and has been tested; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology; and (4) whether the theory has been generally accepted by the scientific community.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (summarizing *Daubert* factors).  However, in *Kumho Tire*, the Court explained that "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Id*. at 141-42.  The reliability inquiry is designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual

rigor that characterizes the practice of an expert in the relevant field." *Marmo*, 457 F.3d at 757 (quoting *Kumho Tire*, 526 U.S. at 152).

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id*. at 758; *see also Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

## II.     EXPERTS

Webb does not appear to object to the qualifications of any of Ethicon's experts. Instead, she challenges the sufficiency of the basis for their conclusions under Federal Rule of Evidence 702 and *Daubert*.

### A.     Dr. Rubenstein

The bulk of Webb's expert witness challenges are directed at Dr. Rubenstein. Specifically, Webb seeks to exclude the following opinions by Dr. Rubenstein: (1) Webb had cognitive impairment before her ICU hospitalization; (2) Webb's ICU stay could not have caused her brain injury because her August 21, 2014 MRI showed no evidence of brain atrophy; (3) Webb's hypoxia at the ICU could not have caused a brain injury; (4) Webb's delirium at the ICU could not have caused her brain injury; and (5) Webb's March 18, 2009 drug screen was a positive result.

### 1.      Preexisting Cognitive Impairment and MRI Results

As to the first and second challenges, Webb's basis for excluding Dr. Rubenstein's testimony is that Dr. Rubenstein's conclusions contradict positions taken by other experts in this case and that his findings are insufficiently supported by the evidence.   With respect to a preexisting cognitive impairment, Webb argues that although other experts have agreed there is no evidence that Webb had a cognitive impairment prior to August 2009, Dr. Rubenstein concludes that there was one.   To the extent Dr. Rubenstein disagrees with the conclusions of other experts, the Court finds that this is not a sufficient basis for excluding Rubenstein's testimony.   Although Drs. Levy and Roberts concluded there was no physical evidence of a preexisting cognitive impairment, their contrary opinion does not mean that Dr. Rubenstein could not credibly reach a different conclusion.

Similarly, Webb maintains that Dr. Rubenstein is unique among experts in this case in concluding that a brain injury must display visual indications of atrophy on an MRI.   Without evidence that Dr. Rubenstein's view is contrary to accepted scientific practice, however, the Court does not find the opposing views of other experts in this case to preclude Dr. Rubenstein's testimony.   In fact, Dr. Rubenstein maintains that Dr. Jackson, the plaintiff's neuropsychology expert, holds the same view as to visualizable brain atrophy on an MRI.   Because Webb offers no evidence – aside from the views of other experts in this case – that Dr. Rubenstein's position is not a valid or

accepted one, the Court will not treat the contrary views of other experts in this case as prohibiting Dr. Rubenstein's testimony. *See Kumho Tire Co.*, 526 U.S. at 149-50.

Webb further argues that no evidence indicates that she abused substances to a degree that caused cognitive impairment prior to her surgeries. This challenge to the sufficiency of the evidence supporting Dr. Rubenstein's findings has more force. If Dr. Rubenstein's conclusions are "so fundamentally unsupported that [they] can offer no assistance to the jury," *Bonner*, 259 F.3d at 929-30 (internal quotation marks omitted), then the Court must exclude the testimony. Webb's argument is undermined, however, by the number of records Dr. Rubenstein cites in which treatment providers have acknowledged Webb's prior or contemporaneous substance or alcohol use. Webb has at times given conflicting reports to treatment providers or attorneys, but Dr. Rubenstein has cited multiple sources to support his conclusions.

Webb relies heavily on an answer Dr. Rubenstein gave in his deposition, stating that "if you're asking me if there's any medical record entries that she had impaired function before the surgery, that she had alcohol withdrawal before the surgery, that she had impaired occupational issues prior to the surgery, I would say no, there were no pre." (Rubenstein Dep. at 185:5-11.) Even if there were no medical tests documenting a preexisting cognitive decline or substance abuse, the Court finds that Dr. Rubenstein has drawn on several other evidentiary sources to form his conclusions. He has pointed to self-reports of extensive drug and alcohol use by Webb, including Webb's own testimony at her deposition for this trial. Additionally, he has identified a medical record in which a provider was concerned about alcohol withdrawal for Webb; deposition testimony from

- 15 -

other doctors who concluded that Webb had a history of heavy drug and alcohol use; and a March 2009 police report that reported Webb had an elevated blood alcohol content upon her arrest.  (*Id.* at 184:18-187:25.)  To the extent Webb believes Dr. Rubenstein's conclusions do not accurately reflect the entirety of her medical history or mischaracterize Webb's substance usage, the Court finds that this is a proper subject for cross examination.  *Bonner*, 259 F.3d at 929 ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (internal quotation marks omitted)).  Accordingly, the Court will deny Webb's motion as to the preexistence of a cognitive impairment due to substance abuse and the 2014 MRI results.

### 2.     Hypoxia and Delirium

Webb also challenges Dr. Rubenstein's conclusions that her hypoxia and delirium while in the ICU could not have caused a critical brain injury.  Here again, Webb's objection is to the factual basis of Dr. Rubenstein's conclusions.  Webb maintains that she had a severely low blood pressure on August 6, 2009, which Dr. Rubenstein ignored.  Additionally, Webb points out that she was treated with vasopressors – medications designed for septic shock and hypotension – which Dr. Rubenstein did not discuss in his report.  She argues that these are essential facts that Dr. Rubenstein has ignored and which, had he taken them into account, should have caused him to conclude that Webb could suffer a brain injury from hypoxia.  As to delirium, Webb argues that

Dr. Rubenstein misconstrued a medical study on which he relied ("the Patel study").  She identifies several findings in the Patel study that she contends Dr. Rubenstein incorrectly applied and that would support a finding that Webb suffered from "persistent delirium," which can cause a brain injury.

As with the testimony about Webb's substance abuse history, these types of arguments are more appropriately the subject of cross examination.  Dr. Rubenstein's conclusions about hypoxia and delirium are not unsupported.  Webb may have grounds on which to attack the basis for Dr. Rubenstein's conclusions, but "when evaluating an expert's opinion, '[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate.'"  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 615 (8th Cir. 2011) (quoting *Daubert*, 509 U.S. at 595).   "[W]hen parties dispute the specific numbers to be used in an otherwise reliable scientific analysis, the alleged flaws . . . are of a character that impugn the accuracy of [the expert's] results, not the general scientific reliability of his methods." *Id.* at 614 (internal quotation marks omitted).  Because Webb's issue is with the accuracy of Dr. Rubenstein's analysis rather than the general reliability of his methods, the Court will permit Dr. Rubenstein to testify to his conclusions and will allow Webb to cross examine him on the basis for his conclusions.

### 3.     March 18, 2009 Drug Screen

Finally, Webb seeks to exclude Dr. Rubenstein's testimony to the extent it discusses Webb's March 18, 2009 preliminary drug screen.  The March 18 screen was a

preliminary urine toxicology screen that indicated positive for amphetamine. No additional follow-up tests were ordered, so the test result remains unconfirmed. Webb argues that urine toxicology tests are subject to false positive results and that, because no confirmation tests were performed, the results are unreliable in this case. Therefore, she asks the Court to exclude any testimony based on the results.

In 2006, the Minnesota Court of Appeals rejected a challenge to urine test results when a similar argument was raised about the susceptibility of urine toxicology screens to false positive results. *Plocher v. Comm'r of Pub. Safety*, No. A05-324, 2006 WL 91548, at \*6-\*7 (Minn. Ct. App. Jan. 17, 2006). The appellant – who had a history of a false positive urine test – sought to exclude the results of a subsequent urine test on the grounds that the test was not reliable. *Id.* The court rejected his argument, explaining that urine test results are entitled to "prima facie reliability," and evidence of other false positive results does not overcome that standard, and as such, that evidence should not be excluded. *Id.* at \*7.

Similarly, the District of Massachusetts has allowed experts to testify to urine drug test results, even though such tests "could result in false positives, as well as false negatives due to the low sensitivity of the tests to certain drugs." *United States v. Zolot*, 968 F. Supp. 2d 411, 434 (D. Mass. 2013). The court acknowledged that the potential for false results warranted caution in how such test results are used. *Id.* Nonetheless, the court concluded that while such tests have "limitations, when used properly in conjunction with other clinical information, they were useful in determining whether a patient is misusing, abusing, or diverting drugs." *Id.*

In this case, Dr. Rubenstein has not based his conclusions about Webb's substance abuse history or cognitive decline solely on the March 18, 2009 result. Rather, as the court recommended in *Zolot*, he used the result in combination with self-reports and other medical reports to come to the conclusion that Webb likely experienced a loss of cognitive function prior to August 2009 as a result of substance abuse. By using the March 18 preliminary drug screen result as merely one data point in his analysis, Dr. Rubenstein avoids questionable overreliance on a test that could result in a false positive. Webb will certainly be permitted to cross examine Dr. Rubenstein on the potential for false positive results and the role the March 18 test played in reaching his conclusions, but the Court will not exclude Dr. Rubenstein's testimony as to the results.

One important clarification is necessary, however. Dr. Rubenstein refers in his report to the results of the March 18, 2009 drug screen as an instance in which Webb "tested positive for **methamphetamine**." (Rubenstein Report at 13 (emphasis added).) The results were actually an unconfirmed positive for amphetamine, a weaker substance that can appear in legal products such as Sudafed. While the test could indicate the presence of methamphetamine in Webb's body, other substances could also render a positive result. Because no follow up was conducted in this case, there is no way to know precisely what caused the result. Thus, although the Court will permit Dr. Rubenstein to testify to the results of the test, the Court will not permit him – or any other witness – to testify that the March 18, 2009 preliminary toxicology screen was a positive test for methamphetamine. Such testimony would be misleading to the jury and potentially inappropriately prejudicial.

**B.    Dr. Levy**

Webb's objections to Dr. Levy's testimony are somewhat nebulous, but it appears that she seeks to exclude Dr. Levy's testimony to the extent it relies on any of Dr. Rubenstein's allegedly objectionable conclusions or references the March 18, 2009 preliminary toxicology screen results.   As explained above, the Court will permit Dr. Rubenstein to testify to each of the conclusions Webb seeks to exclude, including a discussion of the urine toxicology results, as Webb's challenges are most appropriately reserved for cross examination.   Because the Court will not exclude Dr. Rubenstein's testimony, neither will the Court exclude Dr. Levy's testimony to the extent it relies on Dr. Rubenstein's testimony.   Additionally, for the reasons stated above, the Court will permit expert testimony as to the urine toxicology screen, so long as the testimony is precise about the "unconfirmed amphetamine positive" – as opposed to methamphetamine – nature of the results.   Because Webb indicates no further basis for exclusion of Dr. Levy's testimony, the Court will deny Webb's motion to the extent it relates to Dr. Levy.

**C.    Dr. Roberts**

The exclusive basis for Webb's challenge to Dr. Roberts's testimony is that he erred in concluding that Webb's grade school Lorge-Thorndike IQ test result was not a reliable measure of her pre-2009 hospitalization intellectual functioning.   Webb argues that the Lorge-Thorndike test has been administered in Minnesota for many years and that Dr. Roberts offers no support for his conclusion that the test is unreliable.   The Court

finds that this is a matter for cross-examination and not exclusion of Dr. Roberts's testimony before trial.

Rule 702 requires that an expert's testimony is based on specialized knowledge, that the proposed expert is qualified to assist the finder of fact, and that the evidence is reliable in an evidentiary sense. *Lauzon*, 270 F.3d at 686. Webb makes no challenge to Dr. Roberts's qualifications or expertise in the field of intelligence testing. Her challenge is limited to the foundation for his conclusion that the Lorge-Thorndike is an unreliable measure of intelligence. First, the test was applied to Webb more than four decades ago, when she was still a child. Second, Dr. Roberts is a qualified neuropsychologist who testified that the Lorge-Thorndike is no longer used and he is not familiar with any psychologists or neuropsychologists who would rely on it. He need not explain why the test has been abandoned in order to testify to his conclusions in this case. If Webb believes the test is still used and reasonably relied upon by experts in the field of neuropsychology, she may cross examine Dr. Roberts on his conclusions at trial. At this time, the Court will deny the motion to exclude Dr. Roberts's testimony and will permit him to offer his conclusions about the various intelligence tests Webb has undergone in her lifetime.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Webb's Motion to Exclude or Limit Opinions of Defendant's Experts [Docket No. 303] is **DENIED**.[4]


DATED:   November 4, 2015              _s/ John R. Tunheim_
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                                          Chief Judge
                                             United States District Court

---

[4] Although the motion is denied, the Court emphasizes that any testimony as to the March 18, 2009 urine toxicology screen results must accurately identify the results as referring to amphetamine, not methamphetamine.